UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
HUI ZHANG ALTMAN,

      Plaintiffs,

  - against -

NEW YORK CITY DEPARTMENT OF
EDUCATION,
      Defendants.
-------------------------------------------------------------------x

06 Civ. 6319 (HB)

<u>OPINION & ORDER</u>

**Hon. HAROLD BAER, JR., District Judge:**

  Plaintiff *pro se* Hui Zhang Altman ("Plaintiff" or "Altman") filed a complaint against Defendant New York City Board of Education ("BOE") and four individual Defendants, David Kroun, Claralee Irobunda, Steven Chernigoff, and Olivia Ifill-Lynch. Plaintiff alleged that she was discriminated and retaliated against on the basis of her national origin, in violation of Title VII of the Civil Rights Act of 1964, <u>see</u> 42 U.S.C. §§ 2000e – 2000e-17 (2007), and age, in violation of the Age Discrimination in Employment Act ("ADEA"), <u>see</u> 29 U.S.C. §§ 621 – 634 (2007). On March 23, 2007, I dismissed Plaintiff's claims against the individual Defendants in their individual capacities. <u>See</u> <u>Altman v. N.Y. City of Dep't of Educ.</u>, 2007 U.S. Dist. LEXIS 20418, at *5-7 (S.D.N.Y. Mar. 23, 2007).

  Defendants then filed a motion for summary judgment. On May 3, 2007, I denied Defendants' motion for summary judgment on the Title VII claims because, using the more liberal test allowed to a party that proceeds *pro* se, I determined that issues of material fact remained. However, I granted Defendants' motion for summary judgment on the ADEA claim, because Plaintiff did not state facts sufficient to support those claims. The Bench Trial began on July 30, 2007 and concluded on July 31, 2007.

      **I. FINDINGS OF FACT**

  Plaintiff *pro se* Hui Zhang Altman ("Altman" or "Plaintiff") is a 48-year old woman of Chinese national origin. <u>See</u> Pl. Compl. at 3, 5. Altman was hired to teach at Morris High School ("Morris"), where her claims arose, in September 1998. Tr. at 158. At the time of her

1

hiring Plaintiff was licensed in English but not in English as a Second Language ("ESL"), Plaintiff nonetheless began teaching both classes.[1]

At the time of Plaintiff's arrival, Morris was one of the lowest-performing high schools in the Bronx, with meager attendance and graduation rates and conversely high dropout rates.[2] Tr. at 229-30. One of the ways that the administration at Morris sought to address these concerns was to regularly observe teachers in their classroom environment in order to identify areas for improvement in how the school might more effectively fulfill its educational mission. This evaluation policy was in place even before Plaintiff's arrival at Morris and continued throughout her tenure there. Thus, soon after her arrival in 1998, Plaintiff's supervisors began visiting her classes and providing evaluations based on their observations.

Iris Zucker ("Zucker"), who from 1997 to 2002 was the assistant principal for foreign languages and ESL at Morris, visited Plaintiff's class at least five times between November 13, 1998 and May 25, 1999; after each visit, Zucker rated Plaintiff "Satisfactory." Def. Ex. A, B, C, D, and E. On May 5, 2000, the assistant principal for English, Michael Nemoytin, observed Plaintiff in her class and likewise gave her a rating of "Satisfactory." Def. Ex. F. Later, on October 23, 2000, Plaintiff received another "Satisfactory" rating, this time from Joseph Sherman, another assistant principal.

At the beginning of the 2001 academic year, Morris brought in several new people to join the administration: Steven Chernigoff ("Chernigoff") was hired as the assistant principal for English, Tr. at 98; Jose Ruiz ("Ruiz") was hired as the principal, Tr. at 174; and Claralee Irobunda ("Irobunda") was hired as assistant principal for guidance, Tr. at 202. As with their predecessors, these three continued the policy of observing Morris teachers—including Plaintiff—in the classroom.

In September 2001, then-Assistant Principal Chernigoff identified Plaintiff as one of the teachers in need of extra support and observation. Tr. at 98. Chernigoff testified that "there were many times in which I went in to observe her formally and to give her an evaluation and the

---

[1] Jose Ruiz, who began at Morris as the principal in 2001, testified that "sometimes there are not enough classes for one teacher, one subject, so what we do is give them either ESL classes and some English or some English classes and some additional ESL. Tr. at 175-76.
[2] Claralee Irobunda, who arrived at Morris as an assistant principal in 2001, testified that when she began, the school had only a 66 percent attendance rate, that "they were taking a class of 400 to 600 students and only 69 students would graduate," and that the dropout rate was approximately 30 percent. Tr. at 202, 229-30.

2

lesson was not strong enough in order to get a satisfactory observation." Tr. at 100. He states he "worked with Ms. Altman in order not to give her an unsatisfactory, but in order to work with her and support her and help her in getting a satisfactory observation." Id. It appears, though, that these efforts were not successful. In December 2002, Chernigoff rated Plaintiff's lesson "unsatisfactory," explaining that "[Altman] did not achieve her objectives for the lesson." Def. Ex. M. Chernigoff also observed that Plaintiff displayed poor classroom management skills and pedagogical techniques, and did not engage the students or solicit adequate class participation during her lesson. See, e.g., id.

In response to this rating, Plaintiff wrote a complaint letter to Principal Ruiz on January 3, 2003, stating that she had never before received a rating of "Unsatisfactory," and opining that for Chernigoff to give her an unsatisfactory rating "he has to have so much hatred and prejudice against me in his heart." Def. Ex. CCC.

Later in 2003, Plaintiff left Morris to teach ESL at the High School of Violin and Dance. Tr. at 171. Plaintiff did not remain in her new position for very long and returned to Morris after only one semester.[3] Tr. at 173. Once back at Morris, Plaintiff resumed teaching ESL. On March 10, 2004, Chernigoff again observed Plaintiff's class and again rated Plaintiff "Unsatisfactory." In his review, Chernigoff stated: "[a]s a teacher of language and literature, you must model appropriate language usage for your students. The . . . handout sheet [you prepared] was littered with incorrect spellings, inconsistencies, and grammatical errors . . ." Def. Ex. II. Chernigoff also noted that the lesson Plaintiff assigned to her students did not comport with the book that Plaintiff was assigned to teach. Id.

Once again, Plaintiff wrote a letter of complaint, this time addressed to Principal Claralee Irobunda and dated March 18, 2004. Def. Ex. DDD. In that letter, Plaintiff recounted how well she felt the class that Chernigoff observed had been conducted, and declared that "Mr. Chernigoff knows that I will be getting tenured by the end of this semeseter. By giving my [an Unsatisfactory] rating, he is abusing his power and damaging my future! He is using the power to fulfill his personal revenge against me." Subsequently, Plaintiff's superiors agreed to her request to hold a meeting with Plaintiff, her union representative, Chernigoff, and Irobunda on April 15, 2004 to discuss a "helping plan" for the Plaintiff. Def. Ex. LL.

---

[3] Joseph Sherman, the principal of the High School of Violin and Dance, told Ruiz he did not need Plaintiff for the following school year, remarking that "she was not working out well in his school as a teacher."

3

Despite these accommodations, Plaintiff continued to receive unsatisfactory ratings. On April 30, 2004, Principal Irobunda rated Plaintiff "unsatisfactory," stating that Plaintiff "did not model language appropriately," and, for example, mispronounced the words "ornament," "foamy," "wreckage," and "hasten." Def. Ex. NN. Irobunda also noted that "[s]tudents did not produce enough oral language for an ESL class . . . . the implementation of the lesson was flawed . . . . [Altman had] low expectation of [her] students . . . [Altman's] cell phone went off . . . and [Altman] answered it." Id.

Once again May 24, 2004, Principal Irobunda observed Plaintiff's class and rated her "unsatisfactory" because of her inability to "model properly." Def. Ex. QQ. Thereafter, Irobunda apparently notified Olivia Ifill-Lynch ("Ifill-Lynch"), the superintendent, that Irobunda "would like to rate [Plaintiff] unsatisfactory and would like the superintendent to deny her completion of probation" for her ESL license. Tr. at 246. As a result, Ifill-Lynch sent David Kroun ("Kroun"), an administrator in the New York school system, to observe Plaintiff and provide an evaluation.[4] Kroun visited Plaintiff's class on June 15, 2004, and his evaluation matched Irobunda's rating of unsatisfactory. Included in some two-dozen areas of concern that Kroun identified in his detailed report were Plaintiff's failure to have a lesson plan, to properly prepare students, to give an appropriate assignment on written exercises, to give appropriate guidelines for completing class work, to give clear expectations regarding assignments, and to provide students with feedback on their writing. Def. Ex. RR. Kroun recommended to the Superintendent that Plaintiff be denied completion of probation. Id. Superintendent Olivia Ifill-Lynch denied Plaintiff her completion of probation, stating that Plaintiff's employment would terminate effective August 20, 2004. Id.

Plaintiff appealed this decision to the to the Chancellor's Committee, who also denied. See Ex. KK. Plaintiff filed a complaint with the New York State Division of Human Rights on December 14, 2004 and was dismissed on April 20, 2004. The EEOC mailed Plaintiff a "right-to-sue" letter on June 7, 2006. On July 12, 2006, Plaintiff filed this complaint alleging she was discriminated and retaliated against on the basis of her national origin, in violation of Title VII of

---

[4] Kroun testified that "the chancellor's regulations at the time [provided] that superintendents or their designee must examine the work of unsatisfactory teachers." Tr. at 257. Kroun went on to explain that "the superintendent asked me to investigate the matter, and I reviewed the file for that year, and then indicated to the superintendent that I think it would be appropriate if I made a visit, and the purpose of the visit was to make a recommendation to the superintendent as to whether they should deny completion of probation or not do that, with the final decision resting with the superintendent." Tr. at 246.

the Civil Rights Act of 1964, see 42 U.S.C. §§ 2000e – 2000e-17 (2007), and age, in violation of the Age Discrimination in Employment Act ("ADEA"), see 29 U.S.C. §§ 621 – 634 (2007).

## II.   CONCLUSIONS OF LAW

A. Plaintiff's Discrimination Claim Based on National Origin

To establish a *prima facie* case of discrimination with respect to Title VII, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discriminatory intent. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); see also Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004). If plaintiff establishes these elements, the burden of going forward shifts to the employer to "articulate some legitimate, non-discriminatory reason for the employer's rejection." McDonnell Douglas, 411 U.S. 792, 802. If the employer is able to do so, then the plaintiff, who has the burden of proof throughout, must show that the stated reason is pretextual.

Defendants concede that Plaintiff has made out the first three elements of her prima facie case leaving opposition only to the fourth element—that the material adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.

Plaintiff alleges that "[t]hey fired me by blaming [sic] not to be able to pronounce English correctly because I have a Chinese accent." Pl. Comp. at 6. As courts have recognized, "comments about a person's accent may be probative of discriminatory intent." See Thelusma v. New York City Bd. of Educ., 2006 U.S. Dist. LEXIS 64855, at *6 (E.D.N.Y. Sept. 26, 2006) citing Rivera v. Baccarat, Inc., 10 F. Supp. 2d 318, 324 (S.D.N.Y. 1998) ("Accent and national origin are obviously inextricably intertwined in many cases"); see also Fragante v. City and County of Honolulu, 888 F.2d 591, 596 (2d Cir. 1989). "[A]n adverse employment decision may be predicated upon an individual's accent when –but only when—it interferes materially with job performance." Meng v. Ipanema Shoe Corp., 73 F. Supp. 2d 392, 399 (S.D.N.Y. 1999) (Scheindlin, J.), quoting Fragante v. City and County of Honolulu, 888 F.2d 591, 596-97 (9th Cir. 1989). However, "[t]here is nothing improper about an employer making an honest assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance." Id.

5

Here, some of Defendants' stated reasons for terminating Plaintiff's employment clearly implicate her accent and ability to speak English. For instance, in Irobunda's April 30, 2004 "unsatisfactory" rating of Plaintiff, one of the of her expressed concerns was that Plaintiff "did not model language appropriately," and mispronounced the words "ornament," "foamy," "wreckage," and "hasten." Def. Ex. NN. This assessment was reiterated in Irobunda's May 2004 observation report. Def. Ex. QQ.

However, the Defendants made clear that their assessments of Plaintiff's teaching ability were based on numerous legitimate pedagogical concerns that cannot be said to have anything to do with Plaintiff's accent or national origin.[5] As further noted in her review, Irobunda observed that, because of Plaintiff's mispronunciations, many of the students had difficulty understanding Plaintiff; Irobunda noted that this disrupted the class and, as a consequence, valuable teaching time was lost. Tr. at 216-217. There was concern as well about her poor management of students and her inability to plan an effective teaching lesson. In an informal visit in December 2002, Chernigoff indicated Altman did not write any standards on the board and had difficulty formulating a goal for that day's lesson. Def. Ex. U. Chernigoff indicated: "[Altman] did not achieve her objectives for the lesson," failed to maintain order in the classroom, and did not interact with or solicit student participation in the day's lessons. Def. Ex. M.[6]

I found the combined testimony of the witnesses as to these pedagogical concerns highly credible. The witnesses all have had extensive experience as educators and educational

---

[5] It should also be noted that a number of these concerns were expressed repeatedly over a long period of time. For instance, on December 11, 2001, Chernigoff noted his concern that Plaintiff needed to improve her time management skills in class so that each part of the day's lesson could be adequately covered. Def. Ex. K. This concern was voiced again in a review dated October 1, 2003, Def. Ex. AA, and yet again in a review from January of the following year.

[6] Other than complaining that her lessons ought not to have been rated "unsatisfactory," Plaintiff has not shown any discriminatory intent on the part of her supervisors and related to her termination. In other words, Plaintiff confuses unsatisfactory ratings of her teaching performance with inferences of discriminatory intent. For example, in response to a rating from her supervisor stating she "did not model properly, as we have discussed," Ex. QQ. Plaintiff answers that "this is a lie" and is "because [she is] from China." Tr. at 80. At Morris during the relevant time, however, Plaintiff concedes that another teacher of Chinese national origin, Ms. Xu, who also had an accent, received all satisfactory ratings from her supervisors. Chernigoff states that between 2001 and 2004, Ms. Xu taught English and ESL, had an accent, but always received satisfactory ratings. Tr. at 155. Chernigoff opined that when he started at Morris in September 2001, he paid more attention to all of the weaker teachers, which included Plaintiff but not to those other teachers of Chinese national origin, whose teaching performance was satisfactory. Tr. at 98. Chernigoff testified that he gave Plaintiff's lessons unsatisfactory ratings, not because of Plaintiff's national origin, but simply because her lessons were unsatisfactory. Tr. at 101.

administrators; concomitantly, they have extensive familiarity with teaching methods as well as practice in making legitimate evaluations of such. Mr. Chernigoff testified that prior to coming to Morris as assistant principal in 2001, he taught English and ESL classes at other schools for twelve years.[7] Tr. at 97. Ms. Irobunda testified that she started teaching in 1986, and has since held a number of administrative posts including head of an academic achievement committee, her time at Morris as assistant principal, and her position at the time of trial as principal of an intermediate school.

Even more significant to the present analysis, however, is the fact that at trial Plaintiff provided little or no evidence of any inferences of discriminatory intent. Plaintiff points to the fact that prior to the arrival of Chernigoff, Ruiz, and Irobunda she had only received ratings of "Satisfactory,"[8] See Def. Ex. CCC, as evidence that the "Unsatisfactory" ratings she received after their arrival can only be due to discriminatory animus on their part. However, Plaintiff makes only conclusory, unsubstantiated arguments in support of this contention. On cross-examination at trial, Plaintiff testified as follows:

> Q: Was Mr. Jose Ruiz your principal during the 2002-2003 school year?
> A: Yes.
> Q: And he conducted a formal observation of one of your classes, do you recall that?
> A: Yes.
> Q: And in that observation, he graded the lesson as satisfactory, is that right?
> A: Right.
> Q: But he told you that you needed to make numerous improvements, is that right?
> A: Right.

---

[7] It is important to note that Chernigoff has considerable experience with evaluating teachers, a point to which he testified during his cross-examination at trial:

> Q: Approximately how many teachers have you supervised over the course of your career?
> A: At least 50.
> Q: And based on your experience, how would you describe the plaintiff's overall performance as a teacher?
> A: Relative to the others?
> Q: Yes.
> A: She was one of the weakest I have ever supervised. Tr. at 156.

[8] It should be noted, though, that the earlier "Satisfactory" ratings that Plaintiff received were not unqualified. On the witness stand, Iris Zucker explained that she gave Plaintiff five satisfactory ratings for Plaintiff's ESL classes during 1998-1999 simply because union rules prevented her from rating Plaintiff unsatisfactory because Plaintiff was not licensed to teach ESL:

> Q: …I repeat, there was a technicality. I could not rate [Plaintiff] unsatisfactory.
> A: Would you if you had the opportunity?
> Q: Yes, sure. Tr. at 159-60.

7

> Q: In fact, he recommended that you make pretty much the same improvements that Mr. Chernigoff recommended you make, is that right?
> A: I believe so.
> Q: Did Mr. Ruiz discriminate against you because you are from China?
> A: No.
> Q: But Mr. Chernigoff did?
> A: Yes.

Tr. at 64. Furthermore, the remainder of Plaintiff's testimony is devoid of any substantiation of her allegations of discriminatory intent. When questioned about the complaint letter she wrote in response to Chernigoff's first "Unsatisfactory" rating, Plaintiff testified as follows:

> Q: So in the letter, you don't say anything about Mr. Chernigoff discriminating against you because you're from China, is that right?
> A: Do I have to say it?
> Q: Does it say it?
> A: Must I say it?
> Q: Did you say it in the letter, in writing?
> A: I said harassment. Harassing.
> Q: But you didn't say because you're from China.
> A: It's obviously.
> Q: And you didn't say that he gave you a negative evaluation because of your accent?
> A: That's my first U rating. I didn't realize until later, I realize yes, that's the reason.

Tr. at 86-87. Again referring to her complaint letter to Ms. Irobunda after Chernigoff's second negative evaluation, Plaintiff gives similarly conclusory statements:

> Q: And in this letter [to Principal Irobunda] you don't say anything about Mr. Chernigoff discriminating against you because you're from China.
> A: No.
> Q: And you don't say anything about him disliking you because you're from China, right?
> A: Do I have to say it?
> Q: Did you say it?
> A: No, I didn't say it, but obviously it's the truth.

Tr. at 88. Nor, by Plaintiff's own admission, did she allege national origin discrimination in the grievance she filed to have the negative evaluations removed from her record, or in the hearing based on that grievance, claiming that she didn't realize it was national origin discrimination "until later."[9] Tr. at 91-92.

---

[9] Interestingly, when asked what made her realize it, she explained that:

> I realized because the union person [Plaintiff's representative at the grievance hearing], the final meeting, the grievance from three different principals, then we have a union person representative and he mentioned about my voice, my accent, my English, using this, I said, that's right, I realize. Before I questioning it, but I didn't—I wasn't sure, until that meeting, and, before I feel, I feel yes, somehow it's not right, why did

8

Altman claims that Chernigoff did not allow her to read the English listening passage to students during the annual administration of the Regents Exam at Morris.[10] Tr. at 110. Chernigoff disputed this claim, though, testifying that when he arrived at Morris in 2001, Plaintiff and the other Chinese teacher, Ms. Xu, came to his office separately to inform him that they would rather not read the listening passage on the English Regents Exam and would instead prefer other teachers to do it. Chernigoff states that he acquiesced to Plaintiff's request. Tr. at 111. Plaintiff in turn disputes Chernigoff's account, averring that she wanted to read the passage, but that Chernigoff refused. Tr. at 111. There is no evidence either way. What is not in dispute, though, is that Altman had never been one of the teachers to read the listening passage on the Regents Exam since the beginning of her employ at Morris in 1998—prior to Chernigoff's arrival—and when Plaintiff came to Chernigoff in 2004 seeking to read the listening passage, she was allowed to read it. Because Plaintiff did not provide any corroboration for her claim that earlier on she was prevented from reading the passage—and in light of the fact that as soon as she requested to read it in 2004, Chernigoff agreed—this is a far cry from providing an inference of discriminatory intent.

Plaintiff also offers in support of her position an incident that occurred in the teacher's lounge. Tr. at 204. Mr. Contaves,[11] a computer technician at Morris, complained that Plaintiff was spitting in the teacher's lounge sink. Id. Irrobunda testified that Contaves reported the incident and that Plaintiff likewise wrote to her about the incident, accusing Contaves of using a racial slur. Id. Pursuant to the usual practice at Morris when such an incident occurred, the administration conducted an investigation. As to the results of that investigation, Irrobunda testified, "Ms. Altman accused the gentleman of calling her a dirty Chinese or something like that," but the investigation provided no evidence for the alleged claim and concluded that, "nothing like that occurred." Tr. at 205.

---

they attack my English, I speak, they know well I speak, and who would write that accuse for attack my— they know I'm from China, I make mistakes. Other people make mistakes. President Bush makes mistakes? Why do they write it down in terms of terminating my job. I think deeply later, a lot of things I discovered later, I didn't realize until, that's right, this is, this is, this the goal, this their purpose. Tr. at 92.

[10] The Regents Exam is a New York State standardized test, designed to test High School student's progress. For the English Regents Exam, a listening passage is administered by reading the passage aloud and having students answer questions, designed to test their comprehension of the read passage. New York City Regents Exams, http://www.nysedregents.org/testing/hsregents.htm

[11] Mr. Contaves was a technical employee who worked with computers at Morris. He was not in any supervisory position and was not responsible at all for any adverse employment action at Morris.

It is also worth noting that Contaves was not Altman's supervisor and thus did not have the capacity to take any adverse action against her. Interestingly, during the time that Plaintiff complained about her unsatisfactory ratings to her superiors, filed her original grievance, and met with her union representative, she never once complained of adverse treatment because of discrimination based on her national origin. Tr. at 92. Only after meeting with her union representative does Plaintiff allege discrimination based on her national origin.

In short, Plaintiff has failed to show any evidence of discriminatory intent, and her Title VII discrimination claim must be dismissed.

### B. Plaintiff's Retaliation Claim Based on National Origin

To establish a *prima facie* case under the anti-retaliation provision of Title VII, a plaintiff must show (1) participation in a protected activity, (2) knowledge by plaintiff's employer of the protected activity, (3) "materially adverse" employment action, (4) a causal connection between the protected activity and the materially adverse employment action. See Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 364 (S.D.N.Y. 2006), citing Burlington Northern & Santa Fe Ry. V. White, 126 S. Ct. 2405 (2006).

As to the first factor—participation in a protected activity—the protected activity typically takes the form of the filing of a lawsuit or of a formal complaint with an agency. See, e.g., Johnson v. Palma, 931 F. 2d 203, 207 (1991); Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990); DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987). In Grant v. Hazelett Strip-Casting Corp., 880 F. 2d 1564, 1569 (2d Cir. 1989), the Court stated, "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint." See e.g. EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1012-1014 (9th Cir. 1983) (writing letter to customer of employer complaining about inadequacies in employer's affirmative action program); Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1136-37 (5th Cir. 1981)(boycotting and picketing of store), cert. denied, 455 U.S. 1000 (1982); Coleman v. Wayne State University, 664 F.Supp. 1082, 1092 & n.5 (E.D.Mich. 1987) (stating repeatedly in public and private that university engaged in discriminatory employment practices).

In the present case, however, Plaintiff provided no evidence to establish any instance of retaliation. Plaintiff did not even allege—let alone prove—that there was retaliation for any of her actions that might in the typical case be seen as likely triggers for such retaliation by the Department of Education—e.g. her complaint letters concerning Chernigoff's evaluations, or her

grievance to have those evaluations removed from her record. On the contrary, the record makes clear that the efforts to accommodate Plaintiff were frequent—for example, Chernigoff and Ruiz both testified that when they observed classes that they felt would have deserved an unsatisfactory rating, they postponed their evaluation in the hopes that Plaintiff would be able to improve in the interim; in addition, after Plaintiff complained about Chernigoff's second unsatisfactory rating to Irobunda, the school held a meeting—at Plaintiff's behest—and discussed a "helping plan" to come up with strategies for Plaintiff to improve her performance.

In the face of these examples of conduct that seem to go directly against her claim of retaliation, Plaintiff simply alleges that upon her return to Morris after teaching for a semester at the High School of Violin and Dance, Mr. Chernigoff "avenge[d] and retaliat[ed against]" her. Tr. at 15. There is simply no substantiation for this statement. As discussed above, Plaintiff's supervisors had legitimate pedagogical reasons for the unsatisfactory ratings and for ultimate termination. There is no connection and certainly no proof that Plaintiff's return to Morris High School signaled retaliation of any sort. Indeed, but for her termination, which meets the materially adverse employment action element, there is no proof of any of the three remaining strings to the retaliation bow, and the complaint will be dismissed in its entirety.

### III. CONCLUSION

For the reasons above, the complaint is dismissed. The Clerk of the Court is instructed to close this matter and remove it from my docket.

**IT IS SO ORDERED.**
**New York, New York**
**December \_\_, 2007**

_____
U.S.D.J.

11